May it please the Court, Your Honors, Erica Meharg, on behalf of Plaintiff Appellant San Luis Obispo Coastkeeper and Los Padres Forest Watch, I would like to reserve two minutes for rebuttal. Plaintiffs brought this suit to stop the unlawful take of endangered Southern California steelhead resulting from the operations of Twitchell Dam. There is no dispute in this case that the dam holds back water at key times, primarily during the winter rainy season, when steelhead needs some of those flows to complete their migration between their spawning habitat and the ocean. By interrupting and preventing- May I ask you something? Do the fish migrate upstream of the dam on a fish ladder the way that they do in Oregon? No, Your Honor, this is a unique situation where the fish are migrating on another river body. The two rivers come together to meet and form the Santa Maria River. The dam is on this river and the fish go up to the Cisquak and have their spawning grounds up there. All right, thank you. This is all about the dam holding back water so that the Santa Maria River doesn't have water in it and they cannot complete their passageway from their spawning grounds and the ocean. By interrupting this basic life cycle, the dam operations result in take of steelhead in violation of Section 9 of the Endangered Species Act. Defendants need to modify dam operations only slightly in order to come into compliance with Section 9. They need to release no more than 4% of the water stored behind the dam at key times, and those releases would occur about every three to five years. Instead of making these modest modifications, however, defendants take a maximal position in this case. They argue that Public Law 774, which is the law that authorized the construction of Twitchell Dam, affords them no discretion to release any water to comply with their mandatory duties under the Endangered Species Act. In effect, defendants are arguing there is an irreconcilable and a facial conflict between Public Law 774 and Section 9. Now, of course, a basic tenant of statutory interpretation is that when you have two statutes, you must harmonize those unless there is a clearly expressed congressional intention to the contrary. Defendants have not and cannot show that there is a clearly expressed congressional intention in Public Law 774 that would preclude them from releasing any amount of water to benefit steelhead and to comply. I've read that statute, and I've read the Secretary's opinion. It seems to me that the statute reads that this dam, Twitchell Dam, then called Vaquero, is instituted by Congress for the purpose of flood control and water conservation. Is it your position that, or other purposes, includes the migration of steelhead trout? Is that your interpretation of other purpose in that statute? Your Honor, I think other purposes is an undefined category that allows defendants discretion. Is it undefined, or under the, you used them generous, a reading of statutes which has been approved by the Supreme Court, doesn't it involve other purposes to mean only in the same class as flood control and water conservation? It doesn't mean water skiing, does it? Your Honor, I think that other purposes is undefined in the statute, and the Secretary's report does have a section where it talks about other purposes, but again, Congress didn't specifically limit that authority. But if, sorry. Congress has done what? Didn't specific limit the, does it, sorry. But doesn't the rule of construction require other purposes to mean only in the same class as water conservation and flood control? Your Honor, we have argued that other purposes is broader than that, but I think if- Tell me how you argue that, because I'd like to follow you on that. Sure. Does it involve, for instance, crew races on the river, or water skiing, or what other purposes? Your Honor, I think other purposes can be read to include fish and wildlife because the ESA requires that all activities that federal agencies undertake must include, must comply with the Endangered Species Act. So if this court believes that other purposes does not include fish and wildlife, I think what is important here is that that is not a prerequisite to finding that the ESA is applicable to defendant's activities here. All right, so we'd follow the ESA based on something other than PL 744, other purposes. What is that? Your Honor, there is discretion within the language of Public Law 774, namely that they have to operate, that defendants have to operate the dam substantially in accordance with the Secretary's report. That substantially in accordance language has been interpreted several times, and we point to a long series of cases interpreting similar types of language. In each of those cases, defendants, the defendant agencies have been given discretion to modify the project to deal with changed circumstances. Has the Secretary ever written anything that we could look at to say, by the way, other purposes here means to protect steelhead trout? No, Your Honor, the Secretary hasn't in this case, but I think what is important is that this Court does not need to find that fish and wildlife protection is a purpose of the dam. I'm sorry to interrupt, but if I read the record correctly, the Secretary did take fish into account when it was deciding to build this dam, and as I understood it, the conclusion was that they weren't going to be affected much because they hadn't been using this river for spawning purposes, and if I also understand correctly, that was wrong. That is correct. They were incorrect in their evaluation. What is the relevance of that to our inquiry? Well, Your Honor, I think two points on that. The first point is, what is the relevance of the initial discussion of steelhead? I think it's important to recognize that the agencies were not considering the losses to steelhead as an endangered species. They were considering the losses to steelhead as a sport fishery. Those two values are very distinct under federal law, and just because at the time that Congress authorized the dam, they did not include or expressly require releases to maintain that steelhead fishery. That does not indicate a clearly expressed Congressional intent to prohibit all releases. Moreover, I think within the language of public law— Did Congress ever pass any other legislation saying, now that we're more sensitive to environmental issues, we want to change our language so that we direct the Secretary, when he's substantially complying, to consider steelhead trout? Your Honor, the subsequent legislation is the Endangered Species Act, which applies to agency actions regardless of whether they have an express purpose of fish and wildlife. I think a really good example of this, which was what I was going to answer the second part of your question, is in TVA v. Hill, Tennessee Valley Authority v. Hill, the dam in question there did not have fish and wildlife as an express purpose of the dam. Certainly the Supreme Court found that the endangered species did apply. They enjoined the entire operation of the dam until those agencies could comply with the Endangered Species Act. In passing that, or in determining that, the Supreme Court noted there was a conscious decision by Congress to give endangered species priority over the primary missions of federal agencies. The question in front of this Court is not really, does Twitchell Dam have an express purpose or an implied purpose of fish and wildlife? The question is, does Public Law 774 include an express Congressional intention that would preclude defendants from releasing water for steelhead, even if it is necessary to comply with their clear mandatory duties under the Endangered Species Act? There's nothing in the language of Public Law 774 that precludes such releases. I would point this Court specifically to Wild Earth Guardians v. the Army Corps of Engineers, which is a Tenth Circuit case from 2020. There, the language in the authorizing legislation stated that releases could be made for flood control except as otherwise required by the Rio Grande Compact. The Court there said that that limiting language, releases could be made solely for those specific purposes, meant that the agencies did not have discretion to make releases to comply with the Endangered Species Act. We don't have that type of limiting language in Public Law 774. We have more of an expansive language that defendants do have to operate the dam, but they can do so substantially in accordance with the Secretary's report. Cases time and time again interpreting that type of language have determined that that gives defendants discretion to address changed circumstances. Those changed circumstances— Do you have any additional reports as to this dam? Your Honor, there has been no further Secretary's reports, but I think that the cases that plaintiffs cite to do not require that the Secretary has to issue another planning report. The purposes—those cases state that the agencies have discretion when they are implementing the plan to modify, and specifically to modify, to address subsequent environmental laws. I would point this Court to Kreppel v. The Corps, which is a Fifth Circuit case. There, the project was modified quite extensively, in fact, to address the subsequent passage of the Clean Water Act. The Northwest Environmental Defense Center case from the District of Oregon last year, the American Rivers case from the Eighth Circuit—those projects were modified to address the Endangered Species Act, which were passed after the dams or the projects were authorized. So in each of those cases, the Court has held that the agency has some discretion, and that's what we're talking about here. Any discretion. Do they have any discretion? In all of those cases, the courts have held that agencies have some discretion to deviate from the project plan and from the primary purposes of the project. You're down to about two and a half minutes. Do you want to reserve? Yes, Your Honor. I will. I think—and I think, just to make one more point, is that what we are talking about is if the agencies have any discretions to modify the dam operations, they must use those authorities to comply with the Endangered Species Act. Thank you, Your Honor. Thank you, Counsel. We'll hear from Amicus. Good morning, Your Honors. Tara Mueller representing Amicus State of California. My comments today will focus on the state law issues raised in the state's amicus brief. But at the outset, I'd like to note that the state concurs with the arguments made in Forest Watch's reply brief in this case. The state's interest in this case stems from the trial court's erroneous ruling. A broad ruling by this court upholding that decision that defendants have no discretion to release any water for fish protection purposes under PL 774 could undermine both the state's and the court's ability to apply and enforce state laws protecting fish to this project and possibly other federal reclamation projects. This would be contrary to Congress's clear intent in 774 and Section 8 of the Federal Reclamation Act, as well as contrary to a longstanding and well-established line of federal precedents construing Section 8, which hold that federal water projects generally must comply with all state laws relating to water, with rare exceptions, as I will explain further. As plaintiff's counsel has explained, the fundamental issue to be decided in this case is whether defendants have any discretion under 774 to release any amount of water from Tritchell Dam to avoid take of endangered fish. This is a pure question of statutory interpretation. State law bears directly on this question because both 774 and Section 8 expressly require defendants to comply with state law, quote, relating to water in constructing and operating the dam. And as we've pointed out in our amicus brief, multiple provisions of California law relating to water clearly require all water right holders, water users, and dam owners and operators to protect fish in exercising any right to divert, store, and use water appropriate under state law. Counsel, may I interrupt you for just a second? I remember reading the state law on this issue, the duty of a dam owner to release enough water for fish to be saved below the dam, not above the dam or on other rivers, but below the dam. Does that have any effect here? Yes, correct, Your Honor. The migrating passage is below the dam. So there's the confluence of the Cuyama and Sisquauk Rivers, both of which conjoin below the dam to the Santa Maria River, and then there's eight miles, I believe, approximately until that river reaches the ocean. And withholding water behind Twitchell Dam prevents water from reaching the ocean and fish to migrate either upstream or downstream at critical times of the year for spawning and rearing and outmigrating. But the fish aren't staying below the dam, they're going up a tributary to one side of the dam, right? Does that make a difference? No, Your Honor, because it all pertains to maintaining fish in good condition below the dam under state law. It's all below. The releases then would enable the fish to survive below the dam and without such releases. If the dam owner released enough water so that the fish below the dam could survive, are you saying that they have to release more water in order to allow the fish to migrate up this beyond the dam on the tributary? No, Your Honor, our argument for purposes of this appeal, what the court needs to address in this appeal, is whether the requirement to comply with state law, which is explicit in PL 774, as well as Section 8 of the Reclamation Act, provides defendants with discretion to comply with the federal ESA. And the state's argument is that it clearly does because they have to comply with the state law requirements, which require fish to be protected in the operation of the dam pursuant to state law. So clearly they do have discretion to operate the dam in a manner to avoid take of fish under the ESA. And I would just like to also point out that normally defendants have argued that state law is preempted by a clear congressional directive under the California, the U.S. line of cases. However, their reliance on the dam purposes is insufficient for purposes of facial challenge. And I would direct this court to its decision in the U.S. State Water Resources Control Board case, which explicitly held that this is generally a factual question to be decided, whether there is an actual conflict between state law and any specific congressional directive, and that defendants also bear the burden of the state law. And I see that I'm out of time, but I have some further points if the court would indulge me for a moment. I just want to make three quick points about why there is no clear language on the face of PL 774 that would clearly express a congressional intent to preempt state law. First, PL 774 itself expressly reiterates the requirement to comply with state law broadly relating to water and water rights as a first order of priority in the statute. And second, the statute authorizes the dam to be operated for general other purposes, which language is most reasonably construed to refer to any use that is beneficial under state law and as provided in 43 U.S.C. 372 of the Reclamation Act. So any beneficial use under state law is an authorized purpose under that provision. And I would refer the court to the U.S.C. Alpine Land and Reservoir Company case on that point. And then lastly, I would just like to emphasize that the statute says that the dam operations need to be, and otherwise, and only substantially in accordance with the secretary's report and only after complying with state law. So therefore, for all these reasons, the state would submit that there is ample discretion on the face of the statute for them to comply with the ESA. And I would also like to point out again that a ruling by this court, broad ruling that defendants have no such discretion could be very problematic for compliance with state law as well as the ESA. Thank you, counsel. And if the court... Yes. Thank you, counsel. Thank you very much. Thank you. Good morning, and may it please the court. My name is Kevin McArdle on behalf of the Bureau of Reclamation. And with the court's permission, maybe I'll just start up where counsel for California left off. We also are not seeking any kind of broad ruling here. We're here today defending the district court's ruling because Twitchell is unique, both in the terms of its function, which is all about groundwater recharge, and in terms of the statute, the federal statute that authorizes the project. Would you agree with... In the opening brief, the appellants say that 80% of the water is used by municipalities. Is that correct, the groundwater released? I'm not exactly sure if that's the right figure that's used now. There were annual reports issued pursuant to the stipulation. Could you keep your voice up, please? Yes. I apologize. Yeah, there are annual reports issued in the stipulation that discuss the water uses. They're not part of the record in this case. They are publicly available. That's why I was asking you, just sort of, because they've alleged 80%. Would you agree that it's a substantial amount of the water is used by municipalities? That's a substantial amount. I don't think that's the amount that's used today. I think the vast majority is used by irrigation and agriculture, and that's publicly available. We could provide that if it was material. I would suggest that it's not material. Well, except that if 80% is used for other purposes now, it kind of takes away the primary argument about the statute and its implementation. Well, I don't think that's necessarily true, Your Honor, because House Document 217 specifically addresses that the water would be used for anticipated municipal and industrial growth. We're not talking about a foreign purpose here. So the statute's unique because House Document 217 describes in detail what this project's mandatory water conservation function is, which in this context means groundwater recharge. It shows that the purpose is to prevent Kiama River flows from reaching the ocean so that all of that water can be stored in the groundwater aquifer on which the entire valley depends for its water supply. That's documented throughout the record, but in particular at 150, ER 150, 160, 179, 184, and 191 actually are really important, I think, because they show that the entire design of this project, the decision to allocate 125,000 acre-feet for water conservation, was decided upon because it would be sufficient to conserve all of the winter flows that would otherwise flow into the ocean. And the release limit, which really is the only narrow issue at issue in this case, the release limit, was set in that report and then approved by Congress in order to maximize storage of all conserved water in the aquifer. So turning to the actual issue here, I think it's really important not only to emphasize that this is a one-off project. Nobody wants a broad ruling here. We agree that in most cases where the Congress just authorizes a project without specifying the manner in which its objectives are to be achieved, we have the discretion we need, at least where we're operating the project, to tailor our operations, at least to some degree, in a way that complies with the ESA. But we don't have that here. So just to get to the statutory argument, other purposes, if Congress really meant no other purposes, wouldn't it have said no other purposes instead of other purposes? I mean, it's hard for me, I mean, I'm listening to your argument and I understand the primary purpose of this is not to protect the fish, no question about that. But when Congress says other purposes and then later gives examples, how can you construe that to being no other purposes? Well, Your Honor, I would push back on the theory that they're just examples, if that's okay. Absolutely. It said for other purposes, substantially in accordance with House Document 217, which tells us exactly what those other purposes are, to provide water for municipal and industrial uses, to prevent salinity intrusion into the groundwater aquifer, and to reduce the exorbitant costs of groundwater pumping at the time. So they didn't say in the report, and the Congress didn't say, the report doesn't indicate that those are examples. Those are the only other purposes. And that's actually- It didn't say only other purposes, it just said that they were examples. I mean, they gave examples, they didn't say this is an exclusive list. I mean, that's the puzzlement of this statute. The other question I have for you on the statute is that there's certainly a requirement of substantial compliance. Is there a factual dispute in this case about whether or not the release of the water that the appellants want you to release is not in substantial compliance? No, I don't think there's a factual dispute. I think that's a legal issue, too. If I could just, for a second, go back to other purposes. I think we're using traditional tools of statutory construction. We can isolate what those other purposes are. We've said the House report, it lists those other purposes. It doesn't say they're just examples. Then we have section two of the statute, which is the funding part of it, which indicates that the funding, approximately $17 million, comes directly from House Document 17, all of which was allocated either to water conservation or to flood control, further confirming that those are the two fundamental purposes of the project and that the other purposes, like irrigation listed in the statute, are all in service of water conservation. The second point that I think is critical is that Congress had a statutory process in place to address the exact issue we're debating today, the 1946 Act. That required consultation with state and federal wildlife agencies to identify, quote, means and measures for wildlife protection, including fish. That process was followed to a T. Reclamation sent the plans to those agencies. They reported back. The California Department of Fish and Game addressed the exact issue we're discussing here. Should we require water releases for stealing? And this is about ER 261. And they said no. It would be infeasible in light of the purposes of the project and the permeability of the downstream channel. But doesn't that get to the issue of how you exercise your discretion rather than whether you have discretion? I mean, there are two separate issues, in my view, just in my initial reaction to that. One, do you have the discretion?  Do you agree with that or am I wrong? In general, I think I would agree with that. I think to isolate the two issues, I think it's other purposes and substantially in accordance with. Other purposes, no. Providing water releases for downstream steelhead is not an authorized other purpose because House Document 217 shows that it was rejected pursuant to the exact statutory process that Congress enacted to identify these appropriate measures. So it's not an authorized. Wasn't that, when they looked to the fish, they were wrong in the sense that they thought that the fish weren't going to use this river for spawning and so it wouldn't have any effect. And it turns out that it does have an effect. And Congress later recognized that there are species that can become endangered because of their lack of access to their spawning or habitat or whatever. And so are we to simply ignore the subsequent history and say this is frozen in the time that the dam was built, is that the effect of this? Well, fundamentally, we're trying to determine Congress's intent at that time because that's when the statute was enacted. And obviously, Congress ratified the decision not to include protective measures for these species and that was its intent at the time. So it's impossible to say now that Congress actually intended that we provide water releases for steelhead. But I don't think, I'd have to push back a little on the notion that they were wrong. If you look at those reports, they said fish will seldom be able to enter the river with this project in operation. I'm paraphrasing, I don't have the exact quote, but they said the water would seldom reach the ocean. It wouldn't reach the ocean as much as before. It said the population was small. And they noted that it would be gone if they didn't make these releases. So I don't think there's anything in there that's wrong. And in terms of this change in the legal statute... Well, I thought there was a... I thought they were on the assumption that the fish hadn't been using the river. Well, again, there's... And I'm not sure that that turned out to be quite accurate because now the fish, well, we know that the fish did use the river. Well, I don't think there's any dispute about the conclusions of Fish and Wildlife Service in-house document 217 about the use at that time. So if those weren't wrong, it's possible that it's changed now. I think the extent to which fish use the river now is a disputed fact. That's another issue. All these issues about how much water is needed, you know, is it going to make a difference? Is there even any water to release? Those are all disputed facts. They weren't resolved below because the plaintiffs didn't cross-move. I don't want to belabor that. Can I just ask you one more question? Absolutely. It relates to California. Why shouldn't we look into, have the district court look into what compliance with California law would mean here? Because that is in the documentation in the history. Well, I think, you know, if the court applies the general rule that arguments way below... And I just want to point out, see, I'm not going to belabor that, but two things. One, it's appropriate to apply that rule here because according to the second reply brief from the plaintiffs, it's a factual issue. They accuse us of not meeting our evidentiary burden of proving that there's a conflict. So, it's not a purely legal issue according to them. It's factual. One reason for enforcing the general rule that you got to raise your arguments below. The second is the state of California, under that National Audubon Society from the California Supreme Court, they have an ongoing duty to reform their own license to conform to the public trust doctrine and reasonable use that they could exercise tomorrow according to the plaintiffs and to that. In fact, if you look at FRSER at 10 through 12, the only reason this lawsuit was ever brought is because they refused to exercise that authority. But since that option is available to them today, coming in as an amicus at the appellate level and dropping these new arguments for the first time is not the appropriate course. So, are you saying that they could change their licensing requirements so that the fish would have to be taken into account? Well, that's what the plaintiffs say and that's what this... I don't know what defenses would be available to us. But according to the National Audubon Society case, they don't have just the authority. They have an ongoing duty to police their own prior decisions and to amend them when they're out of compliance with the public trust. So, if that's their position now, that option is available to them and because it is, there would be no miscarriage of justice in enforcing the general rule that you got to raise your arguments below. But if they did that, wouldn't you just say the federal law preempts them? We probably would. But that was your whole argument that the federal law preempts the state laws and their arguments are... I mean, just to continue that, then how do you interpret the language in 4774 that says pursuant to the laws of California relating to water and water rights? I mean, it would seem to me that Congress was indicating that it didn't intend to preempt state law on water rights. Well, two things. I think that language comes from the same report, in fact, the same document submitted by the state of California with its recommendations. On the one hand, you had California Department of Fish and Game saying, we're not going to require any water releases. And on the second... I'll give you some more time. On the second... And then two pages earlier or later, I can't remember, or a few pages earlier or later, you have the Division of Water Resources saying, hey, Reclamation has said that it's going to get a water right for this project. We want that put into the statute. So please put in that Reclamation's going to comply with laws relating to water and water rights. So Congress said, okay, and put that in. But there's no possibility they meant... And that means you have to comply with water release... Because that had been rejected in the same report where California requested statutory language. But even putting all that aside... But your argument just was they could change the law and require it. And that's why I'm a little puzzled. Would you mind repeating that? No, I mean, you just made the argument that California itself could change its licensure and require release, if I understood your argument correctly. Well, that's California's position, and that's what the national... Now, I don't know what defenses we would have. We might say that... The Judge of Bay Aisle, well, certainly you would say it's preempted. Right. I mean, at some level, the two issues collapse, right? If we don't have discretion to make... You never get to the state law issue, at least if you rule in our favor, because if we don't have discretion to issue the order because it would conflict with Congress's intent, then the state law would not apply either. Yeah, as I said earlier, exercise of discretion is a different question than whether you have it. You're down to about 30 seconds, but I gave the state two extra minutes, so if you want to... I guess I want to turn back because I never really fully answered, which I think is that the more salient issue is the substantially in accordance with. Now, what does that mean? Like most questions in the law, it calls for some sort of line drawing, right? But fortunately, I don't think we have to draw the line here. The court doesn't have to draw the line because this is clearly on the other side of it. What the plaintiffs are asking for here is us to issue an order to the district to make excess water leases that conflict with the release limit specified in House Document 217 in a way that takes water away from the mandatory conservation objective as detailed in 217 for a purpose that was rejected in 217. Under any construction of the phrase, that's not substantially in accordance with 217. It's directly contrary to it. And so, you know, on that basis, this would... what they're asking for here would not be substantially in accordance with House Document 217, and therefore, we lack discretion to order. I see I'm out of time. Thank you for the extra time, and I'll submit. Thank you. Good morning, Your Honors. Mario Juarez for the Santa Maria Valley Water Conservation District. If it may please the Court. The questions the Court was asking about state law in 5937, let's look at the facts in this case. First of all, Fish and Game, which is the agency chartered with protecting fish, what did they do in the comments that are incorporated into 774? They specifically said that there was no need to release any waters. Although there might be some losses to steelhead fishery, such losses will not be of significant proportions. That's in the record of 2 ER 238. And they did say specifically they were not going to require a fish ladder. They were not going to require that it was not feasible to even require a release of water for the maintenance of fishery. So that was specifically commented on and incorporated into 7074 by Fish and Game. What else did the State of California do? The State of California proceeded to issue the license 10271, which specifically says that we comply completely with state law requirements. And what did they wind up doing again in 1974 after the passage of the ESA? They again renewed the license with no further requirement for anything having to do with fish. And this whole 5937 argument, let's look at the procedural history on this. That was raised by the plaintiffs against the district in state court. They lost. That was raised by the plaintiffs against the Bureau in federal court. They lost there. The State of California was nowhere to be seen. They're collaterally stopped from even raising this 5937 argument. This is a very specific statute. What do we have here? We have a case where the U.S. Supreme Court in Ivanhoe specifically says, Santa Maria Twitchell Dam, you're different. Why are you different? Because Congress went out of its way to say what that dam was for. They even set a maximum percolation rate of 300 cubic feet per second for this particular dam. It was super specific as to no water being wasted to the ocean. That's all over 774. And again, plaintiffs hide from the clear language in the statute because they know that that's what the language says. And the other purposes language is clearly delineated and talked about in the statute specifically. My colleagues already talked about that. So we have a situation here where you're faced with a statute that's extremely focused and extremely clear. There is no water for fish. Fish were considered. Fish and Game commented on it. United States Fish and Wildlife commented on it. And everybody agreed at that point, before the circumstances had been changed, there should be no water for fish. What plaintiffs want and want this court to do is basically expand. If you take the plaintiffs' theory, let's go back to New Orleans and let's tell them, hey, those levees that you created 120 years ago, well, the ESA has been created since. You better take out the levees. We better try to recreate whatever habitat was there. There is no habitat. You're faced with a very specific statute, and the statute is clear. No water can be wasted to the ocean. Thank you. Thank you. May it please the Court, I'm Jeffrey Dunn. I represent the defendant, Intervenor Appelli, the City of Santa Maria. I was asked by the United States to take some of their time, just a brief two minutes, and so to deliver I think something that is best delivered by the city. Twitchell Reservoir is the key component of our water supply. No, that is more true today than it has ever been, given the historical drought conditions that we're in. The City of Santa Maria, as this court is aware, was involved in more than 20 years of litigation, and we're still under the state court jurisdiction on protecting this key component of our water supply, the Twitchell Reservoir. Under this state court judgment, which has now twice been affirmed by state appellate courts in two published decisions, or actually three published decisions on this case, recognizing this, and together more than 1,000 parties who are subject to the state court jurisdiction work together to make sure that Twitchell Reservoir continues to be this viable supply. In the briefing, it talks about in the long term, you know, the average is 30%, the briefing says, on what Twitchell provides. In the drought situation, as you can probably figure out on your own, if you eliminate, because of drought conditions, other sources of supply, then that remaining supply, Twitchell, becomes much more than a 30% supply. And so my point is, more than ever, Twitchell is a key component here. I am deeply troubled after spending now over 20 years involved in that state court litigation and fighting for the water supply for not just the city, but for other municipalities, and for the basin as a whole to be sustainably managed. I have to tell you that I'm deeply troubled by the state's position in this case. To come before this court in an amicus brief, instead of initiating proceedings before the State Water Resources Control Board to give notice and a fair opportunity to be heard by not just my client, but all the parties who depend upon this valuable water resource, all the parties who are subject to that ongoing state court jurisdiction, not to have that happen, but instead just to simply drop in an amicus brief, I find very troubling, because there are other ways to deal with this. I think you've been put in a very difficult position. I think you're being candidly asked to sort of rewrite legislation or add words to legislation that aren't there. I understand sometimes that these statutory interpretation issues come before you, and you're sort of dealt with the cards that you're given, and you have to decide. But our brief points out that if the problem here is best resolved elsewhere or should be resolved elsewhere, Congress can take care of this or should, or the State Water Resources Control Board can take care of this. The federal government is correct. They have a license from the state to operate this reservoir in a certain way. They operate it in the way that the license dictates, which is for maximum groundwater recharge and flood control. That's what they're supposed to do. That's what they do. My time is up. Thank you for the opportunity to be heard. We'll hear rebuttal. Your Honors, defendants have stated that Twitchell Dam is somehow unique. Public Law 774, however, is like many other authorizing legislation for dam projects, where a dam is authorized substantially in accordance with a project plan. In every one of those cases, the agency is given discretion to modify the project to deal with changed circumstances. There is nothing unique here about this legislation. What is the changed circumstance? The changed circumstance, Your Honor, is the passage of the Endangered Species Act and the listing of the species. Moreover, the purpose of the dam is not to prevent water to get to the ocean, nor is the purpose of the dam to maximize percolation at all times. The Secretary's report is clear that water would get to the ocean, seldomly. 2ER-238 and 2ER-191 says that. Moreover, it says that the release recommendations, the maximum percolation rate, would be operated or would be implemented wherever possible. That is also at 2ER-191. The Secretary's report itself leaves discretion. But moreover and more importantly is that the statute, Public Law 774, allows discretion to the agency to deviate from the Secretary's report. Moreover, Your Honor, the Northwest Environmental Defense Center case, I think, is very important here because it allows a change from the specific language of the attached report there. It notes that defendants did not bring forward any evidence that those changes would undermine the purposes of the dam. The same is true here. There are no facts that show that interveners or that any harm would be caused by the releases. And Judge Thomas, this picks up on the point you made, which fundamentally this is a factual question. Just a question. I wasn't arguing. I'm sorry. The question that you asked. I apologize for misstating your point. This is fundamentally a question of fact that depends on how much water is being used and what are the impacts on the purposes of the dam. And I think my time is up, so thank you so much. Thank you. I thank all of you for your arguments this morning. I think we probably could have gone on several hours in this interesting case, so I appreciate the efficiency of your presentations, and we certainly, of course, have read all of your briefing, and we appreciate your efforts in this case. The case to start will be submitted, and we'll be in recess for the morning. Thank you. All rise. Thank you.
judges: SCHROEDER, THOMAS, BEA